```
                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                       TAMPA DIVISION
```

**UNITED STATES OF AMERICA**

VS.                                CASE NO: 8:14-CR-463-T-30AEP

**LORENZO YONAL LEMUS-MAYEN**
_____/

### DEFENDANT LORENZO LEMUS-MAYEN'S SENTENCING MEMORANDUM

The Defendant, LORENZO YONAL LEMUS-MAYEN, by and through his undersigned attorney, hereby files his Sentencing Memorandum, in which he asks this court to grant a variance from the calculated guidelines and impose a reasonable sentence of incarceration, that is sufficient but not greater than necessary to comply with the statutory purposes of sentencing, and in support thereof states as follows:

**I.  Introduction:**

Mr. Lemus-Mayen is scheduled for sentencing before this court on July 14, 2015. The purpose of this memorandum will be to address the question of whether the court should consider granting a variance from the calculated guidelines and whether such a finding would constitute a more appropriately reasonable and necessary sentence for his offence than the guidelines as calculated in the PSR.

**II. Procedural Background.**

On September 27, 2014, the defendant, along with 6

1

"crewmates", was arrested after the vessel on which he was traveling was interdicted and seized by the U.S. Coast Guard. It is estimated the vessel had been transporting a total of 562 kilograms of cocaine, most of which was found floating in a debris field after it apparently had been jettisoned by the crew.

On November 19, 2014, the defendant was charged in a two count Indictment for Conspiracy to Possess with Intent to Distribute Five Kilograms or more of cocaine, and Possession with Intent to Distribute Five Kilograms or More of Cocaine, in violation of 46 U.S.C. 1903(g) and (j) and 21 U.S.G. 841(b)(1)(A)(ii). The defendant pled guilty to count one of the indictment on February 24, 2015, and pursuant to a signed plea agreement, the government agreed to file for dismissal of Count II of the Indictment.

**III. Factual Background:**

**A.  Personal and Family Background**

The defendant was born 39 years ago in a small Guatemalan village. Mr. Lemus-Mayen was born into a very poor family, even by the Guatemala's notorious third-world standards.  His father, Manuel, worked as a gardener for more affluent residents who lived in nearby Guatemala City.  Manuel Lemus, along with the defendant's mother, raised the defendant and his 9 siblings in a small two room thatched-roof hut that had no electricity, plumbing, and a dirt floor.  Economic circumstances forced the defendant to quit school and start working before he was 10 years

old. The defendant has had virtually no formal education.

Through most of his life the defendant earned a scant living as a fisherman. Many years ago, when he was out fishing for shark, several of his fingers were amputated in a mishap at sea. Mr. Lemus-Mayen was unable to receive treatment for this injury for several day because it occurred at the beginning of the fishing trip, and there was still some fishing to do. He bandaged the stumps and finally made it to the hospital three days later.

Mr. Lemus-Mayen met his common-law wife, Flor, when she was 15, and they remain together. They have four children, ages 13 to eleven months. A few years ago the defendant was able to afford the rent on a small lot of property, where he moved in his family. He was able to secure a two room house that actually has shingle roof and a wood floor. It also has plumbing, but only in the bathroom. Water must be hauled to and from the kitchen. A few years ago, the defendant's parents were able to move into the same lot, along with two of Mr. Lemus-Maye's younger siblings, and the group manages the best they can as an extended family.

Mr Lemus-Mayen's greatest hope was to give all his children a more complete education than he received. Unfortunately, his eldest daughter, 13 year old Anayeli, recently followed in her father's footsteps and had to quit school to begin earning money. The defendant has never been arrested or had any significant alcohol or drug issues, and has always had the respect of his friends and neighbors (see attachment). His marriage is strong

and his relationship with his parents and his children is very close. Only crushing poverty has kept Mr. Lemus-Mayen from a relatively happy, fulfilling life.

**B. History of this offense**

The defendant has known for years that significant extra money could be made for those mariners who are willing to put their lives and liberty at risk by transporting "merchandise" from one destination to another. He always knew that merchandise is cocaine, although he has never actually used that substance. Three years ago, when money seemed particularly short, Mr. Lemus-Mayen inquired and a friend arranged a contact with man who could send him on such a trip. Through this contact the defendant got a call in August 2014, when he thought he would be called into action. Whatever activity had been planned at that time was changed and Mr. Lemus-Mayen did not leave on the transport run until late September. After 8 days at sea on a large fishing boat Mr. Lemus-Mayen and several others boarded a go-fast boat loaded with cocaine to meet with another go-fast boat – the *Moises*. The cocaine was transferred on to the *Moises*. Shortly after that, on September 29, 2014 the Moises was stopped by the Coast Guard and both crews were taken into custody. They were not to see an actual jail cell until November 19, 2015.

**C. Captivity of the Defendant while at Sea: September 27 – November 19.**

After his crewmates were taken into captivity and the vessel involved in the offense was processed and sunk, Mr. Mayen was

4

taken below deck and questioned. He was then moved back onto the deck of the Coast Guard cutter in handcuffs where he was chained to the other mariners. He was aware he was in trouble and offered no complaints or resistance, but was sure he would be transported to jail on land or, at least, moved into a hold or a brig somewhere on the cutter while it was at sea. This never happened. Mr. Mayen remained on the deck of that particular cutter, day and night, for nearly 2 weeks, shackled to the other prisoners. After that, the prisoners were transported by Zodiak to another Coast Guard vessel, and then after several weeks another, but the conditions did not change. The prisoners were kept on the deck of the various vessels, chained to one another, and not allowed shelter below the decks.

During their captivity the only shelter provided to the captives was a small tarp, which did provide occasional shade from the sun, but proved ineffective as any protection from the rain, which was constant; or the night chill, which became more pronounced as September turned into November. The prisoners were not fed the same rations as their captors, but were given some canned fruit salad and some occasional rice and beans. They did have plenty of water. Occasionally, one of the prisoners would request some more food, or offer a complaint about a sickness or sunburn. In response, they were encouraged to drink more water.

Some of the prisoners became quite ill during the passage, which could prove to be unpleasant to those who were shackled to them. They did not have a latrine available for use, but were

provided with a five gallon plastic buckets. They were not issued private buckets, but were required to share. A medic did examine the prisoners several times, and they were pronounced fit for detention, and were educated on maintaining proper hydration and the importance of stretching. Mr. Mayen found that the shackles inhibited his stretching exercises. During his eight week captivity, the defendant lost 36 pounds, more than 20% of his weight.

**IV. Pre-sentence Investigative Report and Recommended Guidelines**

In the pre-sentence investigation report submitted in this case on the defendant has been calculated to have a base offense level of 38. The Report correctly indicates the defendant meets the criteria set forth in subdivisions (1)-(5) USSG 5C1.2 (a), therefore decreasing offense level by two. The PSR also correctly recommends the three level reduction for acceptance of responsibility. According to the PSR, the defendant's base level of 33, and with a criminal history of 1, the recommended guideline range for sentencing is 135 to 168 months.

It is the defendant's position that the defendant should be considered for a reasonable variance from the recommended guideline sentence and respectfully requests this court sentence him to a period of time that is sufficient but not greater than necessary.

**V. Memorandum of Law**

A. Since *United States v. Booker* 543 U.S.___, 125 S.Ct. 738 (2005), Federal District Criminal Courts are obliged to assess

6

the need for the sentence imposed –

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offence;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. 3553(a) (2).

The Courts must also examine, as mandatory considerations:

> …the nature and circumstances of the offense and the history and the characteristics of the defendant; the kinds of sentences available; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victim of the offense. 18 U.S.C. 3553(a) (1), (3), (4)-(7).

If this court agrees with the total offense level and criminal history as calculated in the PSR, the defendant urges the court to consider a downward variance from the recommended sentence. In the case of *United States v. Myers*, 353 F.Supp.2d 1026 (S.D. Iowa Jan 25, 2005), the court observed the following; "If the 600-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm" *Myers* at 1027 (quoting the Honorable Myron Thompson, Editorial, *Sentencing and Sensibility*, N.Y. Times, January 21, 2005). The defendant believes that this observation would be well considered in determining an

7

appropriate sentence in the present case.

**B. The defendant's role in the offense should be considered.**

Whether or not the court formally finds the defendant to have a "minor" or "minimal" role in the offense under U.S.S.G. 2D1.1(a)(3) see **United States v. Dorvil**, 784 F.Supp. 849 (S.D. Fla. 1999); and **United States v. DeVaron**, 175 F. 3rd 930 (11th Cir. 2000), it is highly appropriate that the defendant's actual role be considered when fashioning an appropriate sentence. Mr. Lemus-Mayen was not "essential" to the operation and completion of the conspiracy involving the cocaine found aboard the go-fast. He was certainly less culpable than those who owned the boat, as well as the captain of the vessel. The evidence in this case shows the Mr. Lemus-Mayen was, at most, on the boat. There is no evidence that he ever owned the boat, guided the boat, or drove the boat. His presence on the boat is consistent with nothing more than the labor required for removing contraband. Additionally, Mr. Lemus-Mayen lacked any knowledge and understanding of the scope and structure of the enterprise and had no proprietary interest in the cocaine.

**C. When considering the factors reflected in 3553, particularly when focusing on the "history and characteristics of [this] defendant", it would be appropriate for this court grant a downward variance from the recommended guideline sentence**

As described above, from all indications, prior to the activities that gave rise to this offense Mr. Lemus-Mayen was living an exemplary, if poverty-stricken life. He has a close relationship with his wife, parents, children, siblings, and

8

entire extended family. He has had no prior problems or encounters with the Honduran authorities, and appears to be a person held in some esteem by those who know him. Attached to this memorandum are 18 (translated) letters written by friends and neighbors who hold Mr. Lemus-Mayen in high regard and speak with one voice about his character and reputation in his home community. All indications that the behavior that brought him before this court is atypical, and extraordinarily unlikely to be repeated when he finally returns home to his family.

**D.  When considering the factors reflected in 3553, particularly when focusing on a "just punishment for the offense", it would be appropriate for this court to consider the conditions endured by the defendant during the first 54 days of his captivity**.

The defendant has clearly expressed his remorse for the behavior which has resulted in these charges. He deeply regrets the personal weakness and fear that led him to use such poor judgment, which will surely cost him years of incarceration, and bring added hardship to his friends and family. He is not unmindful of evils of the drug trade, and the misery and violence that business has wrought. He has seen it all first-hand and deeply regrets whatever contributions his bad judgment made to the narco-trade. As bad as his behavior was, however, it did not warrant the treatment he was subjected to for nearly two months last fall. It is not unreasonable to suggest the suffering and deprivations suffered during this time should be factored into a final determination of a reasonable sentence.

Since the term on "war on drugs" was coined by President Nixon "Nixon Calls War on Drugs". *The Palm Beach Post*. 18 June

1971J, there has been much debate about whether what resulted amounted to an actual "war", or just metaphor for a series of laws and government policies directed at the control of a societal problem. What is less debatable is it has taken on the appearance of war, complete with the expenditure of billions; armed conflict with a corresponding loss of life; and, as is evidenced in this case, the deployment all branches of the American military. As in most wars, the taking of prisoners is a necessary and foreseeable product of the actions taken. Indeed, it may be argued that in waging this war, the taking of prisoners is the primary objective. The Impact of the War on Drugs on U.S. Incarceration". *Human Rights Watch*. May 2000.

For the sake of argument, it is interesting to contemplate that if this "war" was properly formalized as a declared act of congress, the treatment of the prisoners taken in its name may be subject to the rules of the Geneva Conventions. The Geneva Conventions are rules that apply in times of armed conflict and seek to protect people who are are no longer taking part in hostilities; these include the sick and wounded and members of armed forces at sea, prisoners of war and civilians. The third convention dealt specifically with the treatment of prisoners of war during times of conflict "The Geneva Convention Relative to the Treatment of Prisoners of War". *The American Journal of International Law* **47**: 119–117. 1953. Article 25 of Geneva Convention III provides as follows:

Prisoners of war shall be quartered under conditions as

>    favourable as those for the forces of the Detaining
>    Power who are billeted in the same area. The said
>    conditions shall make allowance for the habits and
>    customs of the prisoners and shall in no case be
>    prejudicial to their health.
>    The foregoing provisions shall apply in particular to
>    the dormitories of prisoners of war as regards both
>    total surface and minimum cubic space, and the general
>    installations, bedding and blankets.
>    The premises provided for the use of prisoners of war
>    individually or collectively, shall be entirely
>    protected from dampness and adequately heated and
>    lighted, in particular between dusk and lights out. All
>    precautions must be taken against the danger of fire.
>    In any camps in which women prisoners of war, as well
>    as men, are accommodated, separate dormitories shall be
>    provided for them. *Text of the Third Geneva Convention*

Obviously, the prisoners taken off the *Moises* were not afforded the quarters mandated by Article 25. Several frightened men were chained together for weeks at sea, with limited food and medical attention, allowed only a few square feet of area to share along with a bucket to contain their vomit and waste. Indeed, risking hyperbole, the specter veers uncomfortably close to a shameful slave-trade Middle Passage journey than the humane treatment of poor villagers from Guatemala and Ecuador caught on a go-fast in possession of cocaine. It could be argued, very possibly, that if the Geneva Conventions applied to our "war on drugs" the treatment of the *Moises* crew could be reasonably treated as a war crime.

    Pointing out that the *Moises* crew were not truly enemy soldiers does not excuse their treatment. It does not take much to imagine the outcry if this arrest occurred on dry land in the United States once it was learned the arrested offenders were shackled and exposed to the elements for weeks at a time. Whether

11

prisoners of war or detained drug offenders, we simply cannot treat our prisoners this way.

Mr. Lemus-Mayen does not want to belabor this point, and understands that the bad choices he has made has brought him hard consequences.  His description of the captivity was related to his attorney in an off-handed manner, and only in response to direct questions about why it took so long for the crew of the *Moises* to be brought to shore. It was told with no regard for its potential use as a defense or mitigation.  The story was apparently confirmed by some of the other defendants on the Moises who bothered to mention it. He was not beaten or treated sadistically by his captors, and he bears them no ill-will.  It is likely the neglectful treatment was the result of the lack of resources and available quarters for prisoners.  It is hoped, however, that in the future the Coast Guard budget includes the costs of transporting prisoners off the boat deck to a dry jail cell in a more expedited manner.

There is no reason why the court should not consider the conditions endured by Mr. Lemus-Mayen when fashioning a reasonable sentence.  Surely, his punishment began upon his arrest, and he will be given credit for the time he was incarcerated on first Coast Guard Cutter. When determining a "just punishment for the offense" under 3553, it is not a stretch for this court to factor not only the length of time he has served, but the disproportionate punishment inflicted during this time.

12

It is the defendant's position that a sentence in the recommended guideline range does not adequately address the above-noted considerations and would result in considerably more incarceration time than this situation call for. A sentence **significantly** below the recommended will more than adequately reflect that this is a serious offense and serve to adequately deter further criminal conduct and protect the public. Moreover, it will address the specific characteristics of this 39-year-old semi-literate Guatemalan father and fisherman with no prior criminal record.

**V. Conclusion**

For foregoing reasons, the defense respectfully requests that this honorable court consider imposing a sentence less than 60 months and ask for a punishment sufficient, but not greater than necessary, to achieve the ends of justice and to comply with the statutory purposes of sentencing.

I HEREBY CERTIFY that a copy of the foregoing has been furnished by ECF to Patrick Scruggs, Esq., Office of the United States Attorney, 400 N. Tampa Street, Suite 3200, Tampa, Florida, 33602, this 11th day of July, 2015.

/S/ Edward Panzica
EDWARD M. PANZICA, ESQUIRE
1601 East Bay Drive, Unit 2
Largo, FL.  33771
(727) 588-0966
FBN.  0710059
Panzicaoffice@gmail.com